WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Collision Chiropractors LLC, | No. CV-24-03625-PHX-SHD |
| Plaintiff, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

Pending before the Court is a motion to dismiss filed by Defendants the State of Arizona, Arizona Board of Chiropractic Examiners (the "Board"), and the Board's chairman Dr. Wayne Bennett (collectively, "Defendants"). (Doc. 20.) For the reasons explained below, the motion will be **granted** with leave to amend.[1]

## I. FACTUAL BACKGROUND

Plaintiff Collision Chiropractors LLC ("Collision") provides "chiropractic services in Arizona." (Doc. 1 ¶ 2.) "The vast majority of [its] patients are individuals that have been involved in an accident and need medical care," and Collision provides such care "on a medical lien basis, meaning that (in most cases) it does not get paid unless and until the patient's personal injury lawsuit is resolved." (*Id.* ¶ 8.)

Although Collision has some employees, it "also operates through a set of contractually bound chiropractors who provide services as member physicians of Collision." (*Id.* ¶ 9.) These contractors "also work in their own practice but agree to work

---

[1] The parties did not request oral argument, so the Court decides these motions without holding a hearing. *See* LRCiv 7.2(f).

as independent 1099 contracted members of Collision." (*Id.* ¶ 10.) Collision, in turn, "consults, provides administrative support, and has direct management of the patient case files and records." (*Id.* ¶ 11.) Collision alleges that "[m]any chiropractors practicing in Arizona utilize a similar business model where working chiropractors are compensated a percentage of the amount the company they work for receives from personal injury cases/settlements." (*Id.* ¶ 13.)

Collision alleges that, although the Board has "been aware of Collision's business model for years and aware that many chiropractors are paid under similar business models, for the past three years the Board has been investigating whether Collision's business practices—in particular, Collision's practice of employing chiropractors as 1099-employees—is in compliance" with Arizona regulations. (*Id.* ¶ 14 (quotation marks omitted).) This began in June 2021, when the Board sent "an investigative letter to Collision's manager." (*Id.* ¶ 15.) Collision asserts that this investigation has "been widely followed throughout Arizona's chiropractic community because many chiropractors operate like Collision" and that the Board "has singularly targeted Collision" and "acted so aggressively that the Board has single-handedly altered widespread market practices—all without any State oversight." (*Id.* ¶ 16.)

Collision cites public Board hearings in which the Board "openly questioned whether Collision's relationship with its contracted physicians constitutes a referral fee or fee splitting" and "resolved to contact each and every one of Collision's contracted member physicians" and inform them that "if they were to self-report they could avoid very severe consequences." (*Id.* ¶¶ 17, 19 (quotation marks omitted).) After these hearings, Collision "wrote to . . . the Executive Director of the Board, advising her that under Arizona law the Board lacked authority to preemptively plea bargain with the independent contractor physicians." (*Id.* ¶ 20.) The Board then "changed course and did not proceed to . . . contact Collision's contracted member physicians." (*Id.* ¶ 22.)

At an April 2024 special meeting, the Board "aggressively questioned its own attorney . . . on the record regarding when and how [the relevant regulation] is to be applied

and/or interpreted." (*Id.* ¶ 24.) In response to confusion about this regulation, "a bill was put forward in the Arizona legislature that, among other things, clarified this issue." (*Id.* ¶ 26.) Around this time, "the Board, through [Dr. Bennett], twice sent emails to every licensed chiropractor in Arizona expressing opposition and outrage towards the bill" using a state-issued email address. (*Id.* ¶ 27.) Dr. Bennett also "signed numerous correspondence and endorsed interpretations of laws and has done so by explicitly relying on his role as the Chairman of the Board"; Collision alleges that the Board's counsel informed the Board that it could not do so. (*See id.* ¶¶ 28, 30–31.)

In one such email, Dr. Bennett stated that fee splitting amongst chiropractors "is illegal in all 50 states and is also prohibited by federal law" and that the legislative bill would "open the door to what is currently illegal fee splitting by chiropractors in Arizona." (*Id.* ¶¶ 32–34 (emphasis omitted).) Dr. Bennett also stated that the Board's duty was to investigate and resolve "statutory violations concerning fee splitting, up to and including license revocation and reporting these violations for criminal prosecution." (*Id.* ¶¶ 32, 35.) Collision asserts Dr. Bennett "ignored the prior advice from [counsel] who specifically warned the Board against providing such legal advice or advisories," and he "repeatedly took positions as to what Arizona law is, what certain Arizona statutes mean, and even threatened chiropractors with revocation for failing to comply with his interpretation of the law." (*Id.* ¶ 36.)

In May 2024, Arizona Senator Janae Shamp "sent an email to Dr. Bennett informing him that his . . . email misstated Arizona law" and that fee splitting "is permissible under certain circumstances." (*Id.* ¶¶ 39–40 (quotation marks omitted).) Dr. Bennett responded that he would "revisit the issues" but that his statement would "serve as an official response to [the] notice advising [Senator Shamp] that [Dr. Bennett] disagree[d] with [Senator Shamp's] allegations on multiple grounds." (*Id.* ¶ 41 (emphasis omitted).) Dr. Bennett "did not present it to the Board" or "seek a consensus of Board Members as to how to respond," so "no official vote took place as to how or even whether a response to Senator Shamp's email should be sent." (*Id.* ¶ 42.)

1  Collision alleges that "the Board and Dr. Bennett's actions to impact market
2  practices related to fee-splitting has already caused significant monetary and reputational
3  harm to Collision." (*Id.* ¶ 44.) For example, "[r]oughly an hour after Dr. Bennett's email
4  went out, one of Collision's contracted member physicians . . . terminated its relationship
5  with Collision." (*Id.* ¶ 45; *see also id.* ¶ 64 (alleging that "multiple contracted chiropractors
6  have already withdrawn from their contracts with Collision").) Additionally, "Collision's
7  competitors are actively using [this] email against Collision." (*Id.* ¶ 47.)

## II.   PROCEDURAL HISTORY

On December 19, 2024, Collision brought this suit against Defendants and asserted a claim under the Sherman Act, 15 U.S.C. § 1. (*Id.* ¶¶ 56–66.)

On January 30, 2025, Defendants filed the motion. (Doc. 20.) On March 4, 2025, Collision responded, (Doc. 30), and on March 11, 2025, Defendants replied, (Doc. 31).

## III.   DISCUSSION

Defendants argue that Collision's complaint should be dismissed for failure to state a claim because (1) Collision "never makes even a threadbare allegation that Dr. Bennett ever had an agreement with the Board or any of its members to stifle competition"; (2) the Complaint does not "allege an effect on *interstate* commerce, which is a jurisdictional requirement"; and (3) the alleged unlawful conduct did not constitute an unreasonable restraint on commerce. (*See* Doc. 20 at 3–6.) Because the jurisdictional issue is dispositive, only that issue is addressed.

"The Sherman Act makes unlawful combinations in restraint of interstate commerce." *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). "Thus involvement of interstate commerce in a defendant's activities is a jurisdictional requirement to actions filed under the Sherman Act." *Id.*; *see also United States v. ORS, Inc.*, 997 F.2d 628, 629 (9th Cir. 1993) ("This requisite relationship to interstate trade or commerce is not only an element of the alleged antitrust offense, but also a necessary jurisdictional requirement.").

Although Defendants did not bring their motion under Rule 12(b)(1), the Court must be assured of its jurisdiction before considering the merits, and the interstate commerce

element is jurisdictional. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) (stating that a federal court must "satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case"). Collision, as the party "asserting jurisdiction," "bears the burden of establishing subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008).

"To make a federal case, a plaintiff must show that the activities in question, although conducted within a state, have a substantial effect on interstate commerce." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1143 (9th Cir. 2003) (quotation marks omitted). It is enough to "demonstrate a substantial effect on interstate commerce generated by [defendants'] infected activity," not a "more particularized showing of an effect on interstate commerce caused by . . . activity that is alleged to be unlawful." *Id.* (citation modified). But a plaintiff cannot "rely on identification of a relevant local activity and . . . presume an interrelationship with some unspecified aspect of interstate commerce." *ORS*, 997 F.2d at 630 (citation omitted). "[J]urisdiction may not be invoked . . . unless the relevant aspect of interstate commerce is identified." *McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980). To do so, the plaintiff "must allege the critical relationship in the pleadings." *Id.*

Collision has not met its burden of establishing in its pleadings—or otherwise—that Defendants' alleged activities affect interstate commerce. The Complaint contains no allegations about the effect on interstate commerce; to the contrary, it is entirely focused on Arizona and the alleged effect on Collision—an Arizona LLC providing services in Arizona (Doc. 1 ¶ 2)—and Arizona's chiropractic community. (*See, e.g.*, *id.* ¶ 1 (alleging that Collision "brings this Sherman Act against [Defendants] who [were] involved in the . . . anti-competitive campaign to stifle legitimate fee-splitting arrangements amongst the chiropractic community *in Arizona*" (emphasis added)); *id.* ¶ 13 (alleging that "[m]any chiropractors practicing *in Arizona* utilize a similar business model" to Collision (emphasis added)); *id.* ¶ 27 (alleging Dr. Bennett sent "emails to every licensed chiropractor *in Arizona*" (emphasis added)); *id.* ¶ 45 (alleging that a "contracted member physician[]" in

"Gilbert Arizona" terminated its relationship with Collision); *id.* ¶ 47 (alleging that a "West Phoenix" competitor is "actively using Bennett's . . . email against Collision"); *id.* ¶ 59 (defining the "relevant market" as "chiropractic services throughout Arizona").)

Although Collision argues in its response that the effect on interstate commerce is "self-evident" based on its business model, (Doc. 30 at 9 (citation modified)), this is insufficient to invoke jurisdiction under the Sherman Act. First, Collision was required to assert these allegations in its pleading. *McLain*, 444 U.S. at 242. Second, as Defendants note, Collision's activities are not the primary focus of an inquiry on the effect on interstate commerce; rather, what is relevant is Defendants' alleged activities. (Doc. 31 at 5.) *McLain*, 444 U.S. at 242 ("To establish the jurisdictional element of Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by *respondents'* brokerage activity."); *see also W. Waste Serv. Sys. v. Universal Waste Control*, 616 F.2d 1094, 1097 (9th Cir. 1980) (interpreting *McLain* to hold that "it was not necessary for the alleged antitrust violations complained of to have affected interstate commerce as long as *defendants' business activities*, independent of the violations, affected interstate commerce" (emphasis added)).

Finally, even if Collision's activities alone were considered for the purpose of "showing that defendants' activities affect interstate commerce through their effect on plaintiffs' interstate activities," *Hahn v. Or. Physicians Serv.*, 689 F.2d 840, 844 (9th Cir. 1982), it is not enough that interstate commerce in and of itself is implicated—there must still be a "substantial effect" on interstate commerce. *Freeman*, 322 F.3d at 1143; *see also Parks v. Watson*, 716 F.2d 646, 661 (9th Cir. 1983) ("There must be a sufficient nexus between the activity and interstate commerce so that it can be said that as a practical matter of economics there is a not insubstantial effect on the line of commerce involved." (quotation marks omitted)). Collision's arguments in its brief are vague and do not show such a substantial effect. (*See* Doc. 30 at 9.)

Because Collision bears the burden to show a substantial effect on interstate commerce, *In re DRAM Antitrust Litig.*, 546 F.3d at 984, its claim will be dismissed.

Collision will be granted leave to amend, however, because it is not "clear that the complaint could not be saved by any amendment." *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1561 (9th Cir. 1987); *see also* 28 U.S.C. § 1653 (providing that "[d]efective allegations of jurisdiction may be amended"). Although Collision's claim appears to concern largely local activities, this does not necessarily mean Collision will be unable to allege a substantial effect on interstate commerce. *See McLain*, 444 U.S. at 245; *Freeman*, 322 F.3d at 1143. Collision will be given the opportunity to plead sufficient jurisdictional facts.

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (Doc. 20) is **granted**.

**IT IS FURTHER ORDERED** that Collision may have **14 days** to file a First Amended Complaint ("FAC"). Consistent with LRCiv 15.1, Collision shall file, concurrently with any FAC, a notice of filing the amended pleading that attaches a copy of the amended pleading indicating in what respect it differs from the Complaint.

**IT IS FURTHER ORDERED** that if Collision does not file a FAC within 14 days of this Order, the Clerk of Court is directed to dismiss this action without prejudice for lack of subject matter jurisdiction and close the case.

Dated this 19th day of September, 2025.

_____
Honorable Sharad H. Desai
United States District Judge