**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Collision Chiropractors LLC,<br>Plaintiff,<br>v.<br>State of Arizona, et al.,<br>Defendants. | No. CV-24-03625-PHX-SHD<br>**ORDER** |

Pending before me is the Motion to Dismiss the First Amended Complaint ("Motion") filed by the State of Arizona, the Arizona Board of Chiropractic Examiners ("the Board"), and the Board's chairman, Dr. Wayne Bennett ("Bennett") (collectively, "Defendants"). (Doc. 35.) For the reasons explained below, the Motion will be **granted**.

## I. BACKGROUND

My prior order granting Defendants' first motion to dismiss (Doc. 32) sets forth the underlying factual allegations in detail, and I do not repeat them here in full. Briefly, Plaintiff Collision Chiropractors, LLC ("Collision") is an Arizona limited liability company that provides chiropractic services, primarily to patients injured in accidents, on a medical lien basis. (Doc. 33 at ¶¶ 2, 8.) Collision operates through both W-2 employees and a network of chiropractors retained as 1099 independent contractors. (*Id.* at ¶¶ 9–11.) Collision alleges that "[m]any chiropractors practicing in Arizona utilize a similar business model where working chiropractors are compensated a percentage of the amount the company they work for receives from personal injury cases/settlements." (*Id.* at ¶ 13.)

Collision alleges that the Board and its chairman, Dr. Wayne Bennett, have engaged in a years-long campaign against fee-splitting arrangements among chiropractors, and asserts a single claim for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (*Id.* at ¶¶ 1, 14, 71–81.) The challenged conduct centers on the Board's investigation of Collision's business model, public board hearings questioning the legality of Collision's contractor arrangements, communications to licensees, and Dr. Bennett's May 1, 2024 email to "every Arizona chiropractor" stating that fee-splitting is illegal and may subject practitioners to license revocation and criminal prosecution. (*Id.* at ¶¶ 14–47.)

On September 19, 2025, I granted Defendants' first motion to dismiss for lack of subject matter jurisdiction, concluding that Collision had failed to plausibly allege a substantial effect on interstate commerce. (Doc. 32 at 4–7.) I explained that "Collision's activities are not the primary focus of an inquiry on the effect on interstate commerce; rather, what is relevant is Defendants' alleged activities," (*id.* at 6 (citing *McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980))), and that the original Complaint's allegations were "entirely focused on Arizona and the alleged effect on Collision," (*id.* at 5). Because I dismissed for lack of subject-matter jurisdiction, I did not reach Defendants' merits arguments that Collision failed to state a Sherman Act claim by inadequately alleging a conspiracy or an unreasonable restraint of trade, or that the state-action immunity defense precludes Collision's claim. I granted Collision leave to amend to plead sufficient jurisdictional facts. (*Id.* at 7.)

On October 3, 2025, Collision filed its First Amended Complaint ("FAC"). (Doc. 33.) In its FAC, Collision retains the allegations of the original Complaint and adds a fifteen-paragraph section titled "Effect on Interstate Commerce." (*Id.* at ¶¶ 56–70.) Those new allegations fall into three categories.

First, Collision alleges that the personal-injury healthcare industry is large and nationwide. It alleges that more than 39.5 million personal injury claims arise each year in the United States, (*id.* at ¶ 58); that insurance companies paid out over $53.1 billion in personal injury claims in 2022, (*id.* at ¶ 59); that approximately 40% of personal injury

claims involve chiropractic care, (*id.*); and that, as a result, billions of dollars are paid to chiropractors throughout the United States, typically by large national insurance companies, (*id.* at ¶ 60). Collision also describes the mechanics by which "[p]ersonal-injury related healthcare" is paid, explaining that providers typically treat patients on a lien basis and are paid out of eventual settlement or judgment proceeds funded by national insurance carriers, and that some providers engage independent contractors who likewise agree to delayed contingent compensation. (*Id.* at ¶¶ 62–64.) Without such agreements, Collision alleges, providers would need to charge more for their services, which would in turn affect the amounts national insurance companies pay to resolve personal injury claims. (*Id.* at ¶ 64.)

Second, Collision alleges facts about its own interstate ties and those of similarly situated businesses. It operates in Arizona and New Mexico, (*id.* at ¶ 67) and has treated personal injury claimants who were injured in California but now reside in Arizona, with the resulting billings funded by money flowing from California to Arizona, (*id.* at ¶ 68). Collision further alleges that several regional and national chiropractic companies operate in Arizona using the same independent-contractor compensation model as Collision and may, because of the Board's conduct, need to employ different business models in different states. (*Id.* at ¶ 69).

Third, Collision alleges that Defendants' conduct itself affects interstate commerce because it "has a direct impact on personal-injury related healthcare treatment including but not limited to the following: how personal-injury related healthcare treatment can be provided; how those who provide such care can be compensated; and how much this health care will cost," "directly affect[ing] who can provide personal-injury related healthcare." (*Id.* at ¶ 57.) Collision further alleges that Defendants seek "to declare illegal any situation where an independent contractor agrees to delayed compensation for a personal injury claimant's care," and that this conduct "has a direct and indirect effect on interstate commerce." (*Id.* at ¶ 65.) And Collision alleges that "[t]he Board's regulation of the chiropractic industry in Arizona . . . affect[s] interstate commerce by: (1) affecting the

amount charged for chiropractic care; (2) affecting the methods by which a business can provide chiropractic care; [and] (3) affecting who can provide chiropractic care," and that "[a]s a result, these policies affect payments that national insurance companies pay to resolve personal injury claims nationwide." (*Id.* at ¶ 70.)

On October 17, 2025, Defendants filed the instant motion to dismiss the FAC. (Doc. 35.) The parties fully briefed the Motion. (Docs. 38, 39.)[1]

## II. DISCUSSION

Defendants argue that the FAC should be dismissed because: (1) it fails to allege a substantial effect on interstate commerce, which is a jurisdictional requirement; (2) Collision fails to plausibly allege a conspiracy; (3) Collision fails to allege an unreasonable restraint; (4) Collision fails to allege a relevant market; (5) Collision fails to allege injury to competition; and (5) Defendants are immune from suit under the state-action doctrine. (*See* Doc. 35 at 3–12.)

Collision cures the jurisdictional defect identified in my prior order, but it fails to state a Section 1 claim because it does not plausibly allege a relevant market or harm to competition in that market.

### A. Subject Matter Jurisdiction

#### 1. Legal Standard

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The party invoking federal jurisdiction bears the burden of establishing jurisdiction. *Id.* A challenge to subject matter jurisdiction may be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Defendants present a facial attack to Collision's FAC. (Doc. 35 at 3.) A facial attack "accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). Courts resolve facial attacks under the same standard as a motion to dismiss.

---

[1] The parties did not request oral argument, and it is not necessary, so this motion is decided without holding a hearing. *See* LRCiv 7.2(f).

*Id*. That is, "[a]ccepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Id*.

"The Sherman Act makes unlawful combinations in restraint of interstate commerce." *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990) (citing 15 U.S.C. § 1). "Thus involvement of interstate commerce in a defendant's activities is a jurisdictional requirement to actions filed under the Sherman Act." *Id.*; *see also United States v. ORS, Inc.*, 997 F.2d 628, 629 (9th Cir. 1993) ("This requisite relationship to interstate trade or commerce is not only an element of the alleged antitrust offense, but also a necessary jurisdictional requirement."). "To make a federal case, a plaintiff must show that the activities in question, although conducted within a state, have a substantial effect on interstate commerce." *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133, 1143 (9th Cir. 2003) (quotation marks omitted). A plaintiff "must allege the critical relationship in the pleadings," *McLain*, 444 U.S. at 242, and "[t]here must be a sufficient nexus between the activity and interstate commerce so that it can be said that as a practical matter of economics there is a not insubstantial effect on the line of commerce involved," *Parks v. Watson*, 716 F.2d 646, 661 (9th Cir. 1983) (quotation marks omitted).

The Ninth Circuit has identified two paths to make this showing: a plaintiff may demonstrate "a substantial effect on interstate commerce generated either by [defendants'] general business activities, or by the alleged antitrust violations themselves." *Musick*, 913 F.2d at 1395 (citation omitted). Either is sufficient. But a plaintiff cannot "rely on identification of a relevant local activity and . . . presume an interrelationship with some unspecified aspect of interstate commerce." *ORS*, 997 F.2d at 630.

**2. Collision Sufficiently Alleges an Interstate-Commerce Nexus**

In my prior order, I concluded that Collision's original Complaint contained no allegations directed at Defendants' interstate footprint and was "entirely focused on Arizona and the alleged effect on Collision." (Doc. 32 at 5.) In its FAC, Collision adds fifteen paragraphs of new allegations concerning interstate commerce. (Doc. 33 at ¶¶ 56–

70.)

Although Collision's interstate-commerce allegations remain heavily focused on Collision and the industry generally, and the specific allegations directed at Defendants' conduct are thin, they are nonetheless sufficient to establish jurisdiction. Collision alleges that the Board regulates a profession whose practitioners operate within a multi-state insurance ecosystem in which national insurance carriers fund treatment provided to personal injury claimants. (Doc. 33 at ¶¶ 58–60, 62.) Collision further alleges that this business model is inseparably linked to a nationwide marketplace involving personal injury law firms, insurance companies, and healthcare providers, and that Defendants' conduct affects not only Arizona providers but also the flow of payments and services across state lines. (*Id.* at ¶¶ 62, 66–70.)

Collision plausibly alleges a sufficient connection to interstate commerce. In *Summit Health, Ltd. v. Pinhas*, the Supreme Court held that the inquiry looks to "the potential harm that would ensue if the conspiracy were successful," rather than the restraint's already-realized effects on the individual plaintiff. 500 U.S. 322, 330–31 (1991). The Court therefore considered "the impact of the restraint on other participants and potential participants in the market from which [the plaintiff] has been excluded," not merely the effect of the alleged conspiracy on the plaintiff, a single ophthalmologist. *Id.* at 332.

The allegations in *Pinhas* and this matter are materially similar. In *Pinhas*, the plaintiff alleged that defendants used a professional-review process to exclude him from a healthcare-services market that served out-of-state patients and received payments from out-of-state sources. *Id.* at 327, 329–32. On those allegations, the Court held that the asserted misuse of a process controlling market access had a sufficient interstate nexus. *Id.* at 332–33. Here, Collision alleges that the affected personal-injury chiropractic market involves multistate providers, patients crossing state lines, payments flowing from California to Arizona, and national insurers that fund personal-injury settlements. (Doc. 33 at ¶¶ 56–70.) As in *Pinhas*, the alleged restraint targets participation in a healthcare-

services market with interstate connections and allegedly threatens other actual and potential market participants. *See* 500 U.S. at 331–32.

Under the forgiving pleading standard applicable at this stage, *see Leite* 749 F.3d at 1121, and given the Supreme Court's guidance that Sherman Act jurisdiction can be based on "wholly local business restraints" with interstate effects, *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 743 (1976); *see Summit Health*, 500 U.S. at 331–32, the FAC passes the pleading threshold. Collision has cured the jurisdictional defect identified in my prior order, and I now address whether Collision has stated a claim.

**B. Failure to State a Claim**

**1. Legal Standard**

Dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) "may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quotation marks omitted). In determining whether a claim satisfies this standard, the court accepts all well-pleaded factual allegations as true and construes the pleadings in the light most favorable to the plaintiff. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court need not accept as true "conclusory statements" or "legal conclusions." *Id.*

Collision brings this suit under Section 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 1 does not proscribe every agreement or practice that

restrains trade; it "outlaws only unreasonable restraints" on trade. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (citation modified). To determine whether a practice unreasonably restrains trade, courts generally apply the "rule of reason" unless the alleged agreement falls within a narrow class of restraints whose anticompetitive effects are sufficiently obvious to warrant per se or abbreviated analysis. *Ohio v. Am. Express Co.*, 585 U.S. 529, 539–41 (2018). The governing inquiry is flexible: "there is generally no categorical line to be drawn" between restraints that allow an intuitively obvious inference of anticompetitive effect and those requiring more detailed analysis. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780 (1999). Instead, the court must undertake an inquiry specific to each case, "looking to the circumstances, details, and logic of a restraint." *Id.* Per se liability, on the other hand, "is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (internal quotation marks omitted).

When the rule of reason test applies, a plaintiff bears the initial burden to plausibly allege the following elements:

> (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." In addition to these elements, plaintiffs must also plead (4) that they were harmed by the defendant's anticompetitive contract, combination, or conspiracy, and that this harm flowed from an "anti-competitive aspect of the practice under scrutiny.

*Brantley*, 675 F.3d at 1197. The fourth element is generally referred to as "antitrust injury" or "antitrust standing." *Id.* (internal quotation marks and citations omitted).

**2. The Rule of Reason Governs the Alleged Restraint**

As a preliminary matter, I determine whether the per se test or the rule of reason test applies to the alleged conduct. Although Collision argues that the per se test applies, it has not alleged the type of agreement that is entitled to a presumption of anticompetitiveness

for a simple reason: the likelihood of anticompetitive effects flowing from Defendants' alleged conduct is not intuitively obvious. *Compare Ariz. v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 348–51 (1982) (per se rule applied where competing physicians agreed on maximum fees), *with Texaco*, 547 U.S. at 6 (distinguishing a joint venture's pricing of its own products from a naked price-fixing agreement between competitors), *and Cal. Dental Ass'n*, 526 U.S. at 770 (declining per se and quick-look analyses of an agreement restricting dentists' price and quality advertising because any anticompetitive effects were not intuitively obvious). Here, Collision challenges the Board's investigation of its contractor arrangement, public Board discussions, the alleged resolution to contact Collision's contracted chiropractors, and Board-related communications concerning fee splitting. (Doc. 33 at ¶¶ 14–47.) The competitive consequences of the alleged conduct depend on the economic and market context of the challenged practice, the market conditions before and after its adoption, and the nature and practical scope of the restraint. *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918). Put another way, any competitive consequences of Defendants' conduct are not intuitively obvious. I therefore apply the rule of reason standard.

**3. Collision Plausibly Alleges a Conspiracy**

Defendants argue that Collision fails to plausibly allege a conspiracy under the second element of a Section 1 claim analyzed under the rule of reason. To state a claim under Section 1, Collision must plausibly allege "a contract, combination or conspiracy among two or more persons or distinct business entities." *Brantley*, 675 F.3d at 1197. Section 1 reaches concerted, rather than wholly unilateral, action. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767–68 (1984). An agreement may be inferred from circumstantial allegations showing a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

At this stage, Collision need not prove an agreement, plead its precise terms, or allege facts excluding every possibility of lawful and independent conduct.

*SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1118–19 (9th Cir. 2022). But it must plead enough factual matter to "suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The allegations must provide plausible grounds to infer the existence of an agreement and raise a reasonable expectation that discovery will reveal evidence of an illegal agreement. *Id*.

In *SmileDirectClub*, the Ninth Circuit rejected the proposition that members and employees of a state professional board cannot form an anticompetitive conspiracy when acting under regulatory authority. 31 F.4th at 1114, 1118–20. At the same time, Board membership alone does not plausibly establish participation in such an agreement; the complaint must allege facts, direct or circumstantial, connecting the pertinent actors to the challenged scheme. *Id*. at 1119–20.

Collision alleges that the five-member Board, which included Bennett as Chair, conducted a three-year investigation into Collision's use of contracted chiropractors despite allegedly knowing that other Arizona chiropractors used similar arrangements. (Doc. 33 at ¶¶ 5, 12–16.) It further alleges that, during public Board meetings, the Board questioned the lawfulness of Collision's business model and resolved to contact each of Collision's contracted physicians to invite self-reporting by warning that they could otherwise face "very severe consequences." (*Id*. at ¶¶ 17, 19.) Collision also alleges that the Board convened a special meeting to question Board counsel concerning the meaning and application of the relevant fee-splitting regulation, and that the Board collectively opposed proposed legislation intended to clarify the regulation. (*Id*. at ¶¶ 24, 26–27.)

Considered together, these allegations describe coordinated deliberation and affirmative collective action directed at Collision's contractor arrangement. They do more than allege that Board members separately participated in the same regulatory matter or engaged in conduct that is merely consistent with an agreement. *See Twombly*, 550 U.S. at 556–57. They plausibly suggest a shared course of conduct sufficient to support an inference of agreement at the pleading stage.

And although Collision separately alleges that Bennett acted without a Board vote

on certain communications, (*id.* at ¶¶ 37, 42–43), those allegations at most limit the inference that every challenged communication reflected collective Board action. They do not negate Collision's separate allegations of collective investigation, public deliberation, and a Board resolution directed at Collision's contractors.

**4. Collision Does Not Plausibly Allege Harm to Competition**

Defendants argue that Collision fails to plead the third element of a Section 1 claim. (Doc. 35 at 11–12; Doc. 39 at 8–10.) Defendants argue that Collision failed to allege an unreasonable restraint because the alleged conduct constitutes ordinary regulatory activity and because Collision failed to allege a relevant market and harm to competition. As explained below, the first argument fails.

As to Defendants' second argument, and at this stage, Collision must plead facts that show that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. *Am. Express Co.*, 585 U.S. at 541. Collision may satisfy that burden in either of two ways. It may directly allege actual detrimental effects in the relevant market, such as reduced output, increased prices, or decreased quality. *Id.* at 541–42. Or it may allege market power in a properly defined relevant market and facts from which an anticompetitive effect may be inferred. *Id.* at 542–43. Because Collision does not plausibly allege direct evidence of actual anticompetitive effects,[2] it must plausibly define the relevant market before it can rely on Defendants' purported market power to establish harm to competition. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

a. <u>Collision Alleges Conduct That Is Not Merely Regulatory</u>

I first address Defendants' argument that the alleged conduct constitutes ordinary regulatory activity: investigation of possible violations of Arizona's fee-splitting rule and communications with licensees concerning the Board's enforcement authority. (Doc. 35 at 11–12.) An unreasonable restraint is one that, in its economic context, suppresses or

---

[2] Collision alleges only harm to itself, and even that harm is alleged at a high level and without any alleged reduction in output, change in pricing, or reduced quality of treatment.

destroys competition rather than merely regulates or promotes competition. *See Chicago Bd. of Trade*, 246 U.S. at 238. A restraint violates the rule of reason when its harm to competition outweighs its procompetitive effects. *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).

The fact that the challenged conduct may be characterized as regulatory does not itself resolve whether the restraint is reasonable. "Every agreement concerning trade, every regulation of trade, restrains." *Chicago Bd. of Trade*, 246 U.S. at 238. The pertinent question thus is not whether Defendants' actions had a regulatory purpose or occurred through a regulatory body; it is whether the alleged restraint "merely regulates and perhaps thereby promotes competition" or instead "may suppress or even destroy competition." *Id.* In making that determination, a court considers the circumstances particular to the challenged practice, including the nature and scope of the restraint, the conditions before and after its adoption, its actual or probable effects, its history, and the purposes offered to justify it. *Id.*; *see also Tanaka*, 252 F.3d at 1063.

Here, Collision alleges that Defendants went beyond investigating whether Collision's contractor arrangements complied with the fee-splitting regulation. Specifically, it alleges that Defendants publicly questioned the lawfulness of Collision's business model, resolved to contact each of Collision's contracted chiropractors and invite self-reporting under threat of "very severe consequences," and used communications to licensees to discourage fee-splitting arrangements. (Doc. 33 at ¶¶ 17–19, 27, 31–36.) Collision further alleges that Defendants issued these communications despite their counsel's warning not to advise licensees about what the governing statutes mean or how to comply with them. (*Id.* at ¶ 30.) Collision also alleges that the fee-splitting regulation that Defendants used to investigate Collision contains an exception for members of a regularly and properly organized business entity; that the regulation's application to independent-contractor relationships was disputed; and that similar prior cases had been dismissed. (*Id.* at ¶¶ 14, 23, 25, 39–40.)

These allegations permit the inference that Defendants used the Board's authority

not simply to enforce a clear regulatory prohibition, but to deter compensation arrangements that may be permissible under the regulation. I therefore reject Defendants' argument that the challenged conduct was necessarily reasonable, merely because it was undertaken in connection with the Board's regulatory functions, and next address whether Collision plausibly defines the relevant market.

b. Collision Does Not Adequately Allege a Relevant Market

A relevant market encompasses both the product market and the geographic market. *Newcal Indus.*, 513 F.3d at 1045. The product market must include reasonably interchangeable products or services, and the geographic market must identify the territory in which sellers compete for purchasers. *Id.*; *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Defining the market allows the Court to assess whether Defendants possess the ability to impair competition; "[w]ithout a definition of the market there is no way to measure [Defendants'] ability to lessen or destroy competition." *Am. Express*, 585 U.S. at 543 (quotation marks omitted). A Section 1 claim "may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus.*, 513 F.3d at 1045.

Collision does not plead a coherent relevant market. As summarized above, Collision operates a chiropractic practice that primarily provides lien-based services to personal-injury patients and retains certain chiropractors as independent contractors. (Doc. 33 at ¶¶ 8–11.) Collision also alleges that many Arizona chiropractors use similar arrangements and that several regional and national chiropractic companies operate in Arizona through comparable independent-contractor models. (*Id.* at ¶¶ 13, 69.) But Collision variously refers to chiropractic services in Arizona, personal-injury-related healthcare treatment, lien-based personal-injury chiropractic services, and a nationwide system involving insurers, law firms, and healthcare providers. (*Id.* at ¶¶ 56–70, 74.) These descriptions do not identify the relevant product or geographic market.

Collision's assertion in its Response that "personal injury-related healthcare treatment" is "a business model intertwined with a national market" does not cure that

deficiency. (Doc. 38 at 16.) That assertion does not identify the services that are reasonably interchangeable from the purchaser's perspective or the territory in which sellers compete for those purchasers. *See Newcal Indus.*, 513 F.3d at 1045.

Nor does Collision's assertion that the FAC "clearly defines the relevant market as lien-based personal injury chiropractic services" suffice. (Doc. 38 at 16.) Collision does not allege why lien-based treatment is a distinct product market rather than a payment arrangement for chiropractic services, why non-lien-based chiropractic care or other treatment alternatives are not reasonably interchangeable, or where providers of the asserted services compete for patients or other purchasers. *See Newcal Indus.*, 513 F.3d at 1045; *see also Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 954–957 (2023) (affirming dismissal of Sherman Act claims where the complaint did not plausibly allege a relevant product market or plead facts supporting the exclusion of reasonably interchangeable alternatives).

c. <u>Collision Does Not Plausibly Allege Injury to Competition</u>

Collision also fails to plausibly allege that Defendants' alleged conduct harmed competition in any market. A Section 1 claimant "may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Brantley*, 675 F.3d at 1198 (quotation marks omitted). It must plead facts showing injury to competition beyond the impact on the claimant itself. *Id.*; *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (explaining that antitrust law protects "competition, not competitors").

Collision alleges that Defendants' investigation, public statements, and communications concerning fee splitting caused certain contracted chiropractors to end or withdraw from their contractual relationships with Collision and endangered Collision's business model. (Doc. 33 at ¶¶ 44–47, 75, 79.) Those allegations describe harm to Collision and its relationships with its contractors. They do not plausibly establish harm to the competitive process.

Collision additionally alleges that preventing providers from using its independent-

contractor compensation model could require some providers to pay workers sooner and could result in higher healthcare prices. (*Id.* at ¶¶ 63–65, 70.) But Collision does not allege that any provider actually increased prices, reduced services, left the market, declined to enter the market, or diminished the quality of care because of Defendants' conduct. It identifies no patient who paid more, received inferior care, was unable to secure chiropractic care, or faced fewer competitive choices. Nor does it allege facts showing a reduction in the output or availability of chiropractic services.

General allegations that the challenged conduct could affect prices, provider compensation, or provider participation do not establish a plausible injury to competition. *See Brantley*, 675 F.3d at 1202 (affirming dismissal because alleged higher prices and reduced consumer choice did not plausibly show injury to competition in the asserted markets). Collision likewise does not allege facts showing that the purported effect on its independent-contractor model foreclosed competitive alternatives or created a meaningful barrier to entry for other chiropractic providers. *Cf. PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 841 (9th Cir. 2022) (finding plausible competitive injury where defendants' conduct allegedly made market entry nearly impossible and led to fewer choices, higher prices, and lower-quality services).

Because Collision alleges injury only to its own contracts and business model but does not allege facts that plausibly show a substantial anticompetitive effect in a properly defined market, I will grant Defendants' motion to dismiss on this ground.[3]

**5. Defendants Are Not Immune from Suit as State Actors**

In addition to its other arguments, Defendants argue that they are immune as state-actors "because Collision fails to allege that they are active participants in the *relevant*

[3] Defendants do not separately argue that Collision fails to plead the fourth element of antitrust injury. But establishing antitrust injury requires that the plaintiff's asserted harm flow from the challenged practice's anticompetitive aspect. *Brantley*, 675 F.3d at 1197–98; *Brunswick*, 429 U.S. at 489. Because Collision does not plausibly allege an injury to competition, Collision's allegations that it lost contracted physicians and suffered harm to its business model do not establish antitrust injury.

market."[4] (Doc. 35 at 8.) When acting in its sovereign capacity, a State is immune from antitrust liability for anticompetitive conduct—often called state-action immunity or *Parker* immunity. *N. C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 503 (2015) [hereinafter *Dental Exam'rs*]; *Parker v. Brown*, 317 U.S. 341, 350–52 (1943). In *Parker*, the Supreme Court held that the Sherman Act does not restrain "state action or official action directed by a state," because the Act targets private business combinations rather than a State's exercise of its sovereign regulatory authority. 317 U.S. at 350–51. Thus, when a State itself adopts and enforces a restraint under legislative command, the restraint is not subject to Sherman Act liability merely because it displaces competition. *Id*. at 351–52.

But when a State delegates control over a market to a nonsovereign actor, it does not always enjoy immunity. *Dental Exam'rs*, 574 U.S. at 505. A nonsovereign actor is defined as "one whose conduct does not automatically qualify as that of the sovereign State itself." *Id*.; *see also Parker*, 317 U.S. at 351. In *Dental Examiners*, the Supreme Court held that a state agency that regulated the practice of dentistry and included licensed dentists in its Board was a "nonsovereign actor." 574 U.S. at 503–504. To qualify for state-action immunity, nonsovereign actors, especially those the State authorizes to regulate their own profession, must use procedures that make their anticompetitive conduct attributable to the state itself. *Id.* at 506. The pertinent question therefore is "whether anticompetitive conduct engaged in by nonsovereign actors should be deemed state action and thus shielded from the antitrust laws." *Id*. (citation modified).

To resolve this question, Courts apply the following two-part test: "A state law or regulatory scheme cannot be the basis for antitrust immunity unless, first, the State has articulated a clear and affirmative policy to allow the anticompetitive conduct, and second, the State provides active supervision of anticompetitive conduct undertaken by private actors." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 631 (1992); *California Retail Liquor*

[4] I need not reach Defendants' immunity argument because I have found Collision fails to state a claim. But because I grant leave to amend, *infra* Section III, I will address this defense.

*Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105; *Dental Exam'rs*, 574 U.S. at 506.

I first address whether Defendants are market participants because, if active market participants controlled the Board, Defendants may invoke state-action immunity only upon satisfying the two-part test. *Dental Exam'rs*, 574 U.S. at 511–512. Defendants argue they are immune as state-actors because "Collision fails to allege that they are active participants in the relevant market." (Doc. 35 at 8.) Defendants specify that Collision does not allege that any Board member participates in the market of "lien-based personal injury chiropractors." (*Id*. at 8–9.)

I found that Collision does not plausibly define a relevant antitrust market, *supra* Section II(B)(4)(b). But that conclusion does not resolve the distinct question of whether the Board is controlled by active market participants for purposes of the state-action doctrine. The active-supervision requirement applies when a State delegates regulatory authority to "a board controlled by active market participants in the occupation the board regulates." *Dental Exam'rs*, 574 U.S. at 511. The inquiry therefore concerns participation in the regulated occupation—chiropractic—not participation in the particular product market that Collision unsuccessfully invokes to establish competitive harm.

Collision argues that Defendants acted as nonsovereign actors when they engaged in the challenged conduct. Collision alleges that Dr. Bennett, who chaired the Board during the relevant period, practiced chiropractic care. (Doc. 33 at ¶ 5.) It further alleges that the Board consists of "market participants (i.e., practicing chiropractors)." (Doc. 33 at ¶ 76.) Those allegations support the inference that at least some Board members were active market participants in the chiropractic profession the Board regulates. *See SmileDirectClub*, 31 F.4th at 1119–20 (concluding that allegations concerning certain dental-board members' participation in the regulated profession and their Board conduct sufficed at the pleading stage to raise a plausible inference of active market participation). Although Defendants characterize the relevant market narrowly and contend that no Board member participates in that market, I cannot resolve that factual contention on a motion to

dismiss. I must accept Collision's well-pleaded allegations as true and draw reasonable inferences in Collision's favor. *Iqbal*, 556 U.S. at 678–679; *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).

Thus, to successfully claim state-action immunity, Defendants must establish that the following requirements are met: (1) clear articulation of a policy to allow the anticompetitive conduct, and (2) active supervision of anticompetitive conduct.

Clear articulation of a policy exists when displacement of competition is the inherent, logical, or ordinary result of authority the legislature delegated. *Dental Exam'rs*, 574 U.S. at 507. The State need not expressly authorize the exact anticompetitive act, but it must have foreseeably contemplated the anticompetitive consequence as consistent with its policy objectives. *Id*. Clear articulation of a policy, however, is rarely sufficient to determine whether an anticompetitive policy is indeed the policy of a State. *Id*. The second requirement, active supervision, "seeks to avoid this harm by requiring the State to review and approve interstitial policies made by the entity claiming immunity." *Id*.

The active supervision requirement has particular force when a State delegates regulatory authority to a board controlled by active market participants in the occupation the board regulates. *Id*. at 505, 510–11. In that circumstance, the board may invoke state-action immunity only if the State actively supervises the challenged conduct. *Id*. at 511. The inquiry turns on the board's actual structure and the risk of private self-dealing, not simply on whether state law denominates the entity a governmental agency. *Id*. at 510–12.

Active supervision requires more than the State's potential ability to review agency conduct. The State supervisor must review the substance of the challenged decision, possess and exercise authority to veto or modify particular decisions so that they conform to state policy, and provide realistic assurance that the restraint advances state policy rather than the private interests of market participants. *Id*. at 515–16 (citing *Patrick v. Burget*, 486 U.S. 94, 100–03 (1988) and *Ticor Title Ins. Co.*, 504 U.S. at 638). A State supervisor who is also an active market participant cannot supply the required independent supervision. *Id*. at 515.

a. Clear Articulation

Arizona has clearly articulated a policy to regulate chiropractic practice and to prohibit certain fee-splitting arrangements. Rule R4-7-902(34) prohibits the direct or indirect division of professional fees for patient referrals, but preserves an exception for members of a "regularly and properly organized business entity recognized by law." Ariz. Admin. Code. R4-7-902(34). Arizona also authorizes the Board to investigate complaints alleging violations of the chiropractic statutes or Board regulations. Ariz. Admin. Code R4-7-301(A).

Those provisions may authorize the Board to investigate whether a chiropractor's particular arrangement violates Rule R4-7-902(34). They do not, however, establish that Arizona clearly articulated a policy to support the broader conduct alleged here. Collision alleges that Defendants went beyond investigating a particular complaint. Specifically, it alleges that the Board publicly questioned Collision's compensation model; resolved to contact every one of Collision's contracted chiropractors to solicit self-reporting under the prospect of avoiding "very severe consequences"; that Dr. Bennett sent a statewide email declaring fee splitting unlawful in all fifty states, prohibited by federal law, and potentially criminal in Arizona; and that Defendants sought to declare unlawful any independent-contractor arrangement involving deferred compensation tied to recoveries for personal-injury care. (Doc. 33 at ¶¶ 17–19, 27–36, 65.) Collision also alleges that it falls within the exception under Rule R4-7-902(34), as it is a "regularly and properly organized business entity recognized by law." (*Id.* at ¶ 18.)

At this stage, I cannot conclude that Arizona's general power to investigate Rule R4-7-902(34) violations necessarily contemplated Defendants' actions, primarily because Collision alleges that it falls within the exception provided under the Rule. (*Id.*) The allegations therefore permit an inference that Defendants pursued a policy of their own rather than a clearly articulated state policy. *See Dental Exam'rs*, 574 U.S. at 506–07.

b. Active Supervision

Even assuming Arizona clearly articulated a policy that reaches the challenged

conduct, Collision plausibly alleges that the Board's structure and operation trigger the active-supervision requirement. This inquiry concerns the Board's actual composition and the risk that its members may pursue private interests; it does not turn solely on the Board's official governmental status. *Dental Exam'rs*, 574 U.S. at 510–12.

Arizona law requires three of the Board's five members to hold chiropractic licenses, while the remaining two members represent the public. Ariz. Rev. Stat. § 32-901(A). Defendants emphasize that the statute does not require the three chiropractic members to actively practice and that Collision expressly identifies only Dr. Bennett as a practicing chiropractor. (Doc. 35 at 9; Doc. 39 at 4–6.) But Collision plausibly alleges that the Board consists of market participants who are practicing chiropractors. (Doc. 33 at ¶ 76.)

At this stage, I cannot determine from the FAC whether active market participants controlled the Board during the challenged conduct. But even if the active-supervision requirement applies, Collision plausibly alleges that the State did not actively supervise the challenged communications and enforcement-related conduct.

Collision specifically alleges that no state official reviewed or approved Dr. Bennett's May 1, 2024 email before he sent it to every licensed chiropractor in Arizona. (*Id*. at ¶¶ 31–37, 51.) It further alleges that the email characterized fee splitting as illegal in all fifty states, prohibited by federal law, and potentially criminal in Arizona; warned that violations could result in license revocation and criminal referral; and opposed pending legislation that would clarify the treatment of fee splitting and independent contractors. (*Id*. at ¶¶ 27, 32–35.) Collision also alleges that an Assistant Attorney General warned Dr. Bennett and the Board against providing licensees with legal advice about the meaning of statutes or instructions about compliance. (*Id*. at ¶¶ 29–31, 36, 53.) Yet, according to Collision, Dr. Bennett proceeded to issue the challenged email using a state-issued address and his title as Board chair. (*Id*. at ¶¶ 31–36.) Collision further alleges that the State neither corrected the purported misstatements nor otherwise reviewed the Board's campaign against fee splitting. (*Id*. at ¶¶ 51–54, 77.)

These allegations, taken as true, do not describe a State supervisor who reviewed the substance of the challenged decision, exercised authority to veto or modify it, or approved the decision as consistent with Arizona policy.[5] *See Dental Exam'rs*, 574 U.S. at 515–16; *Patrick*, 486 U.S. at 100–03; *Ticor Title Ins. Co.*, 504 U.S. at 638 (1992). Accordingly, Collision has plausibly alleged that Defendants' challenged conduct was not automatically sovereign conduct, that the State did not clearly articulate a policy authorizing the precise conduct at issue, and that the State did not actively supervise the conduct. I therefore reject Defendants' state-action-immunity argument at this stage of the proceedings.

## III. LEAVE TO AMEND

Rule 15 provides that the "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). As the term "freely" suggests, this "policy is to be applied with extreme liberality." *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018) (citation omitted). "Although leave to amend should be given freely, denying leave is not an abuse of discretion if it is clear that granting leave to amend would have been futile." *In re Cloudera, Inc.*, 121 F.4th 1180, 1189–90 (9th Cir. 2024) (citation omitted). Because additional factual allegations may cure the pleading deficiencies identified above, I grant Collision leave to amend.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** granting Defendants' Motion to Dismiss, (Doc. 35), with leave to amend.

///

---

[5] Defendants respond that the Board merely investigated compliance with a longstanding regulation and communicated with licensees concerning its enforcement authority. (Doc. 35 at 10; Doc. 39 at 5–6.) That characterization conflicts with Collision's allegations that Defendants went beyond an investigation, acted contrary to counsel's warning, issued statewide legal conclusions and enforcement threats, and did so without state review. I must accept Collision's well-pleaded factual allegations and draw reasonable inferences in its favor at this stage. *Iqbal*, 556 U.S. at 678–79; *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

**IT IS FINALLY ORDERED** that any amended pleading shall be filed by no later than **September 29, 2026**.

Dated this 15th day of September, 2026.

Honorable Sharad H. Desai
United States District Judge